# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| ROBERT BELL, JR., <br><br> Plaintiff, <br><br> v. <br><br> CHARLES SCOTT, <br><br> Defendant. | No. 4:12-CV-559 JAR |

## MEMORANDUM AND ORDER

This matter is before the court on the Motion for Summary Judgment of Defendant Dr. Charles Scott (ECF No. 29). This matter is fully briefed and ready for disposition.

## BACKGROUND

Plaintiff Robert Bell, Jr. ("Plaintiff") is an inmate confined in the Missouri Department of Corrections ("MDOC") at the South Central Correctional Center ("SCCC"). (Statement of Uncontroverted Material Facts in Support of the Motion for Summary Judgment of Defendant Dr. Charles Scott ("DSUMF"), ECF No. 31, ¶1).[1] Dr. Charles Scott was a licensed physician employed by Corizon, Inc. ("Corizon"), formerly known as Correctional Medical Services. (DSUMF, ¶2). Plaintiff filed a §1983 action against defendant Scott for deliberate indifference to his serious medical needs, including: (1) Plaintiff's cracking, painful, peeling skin; and (2) Plaintiff's alleged blood clots.

---

[1] Plaintiff has failed to include a statement of material facts as to which he contends a genuine issue exists, as required under E.D.Mo. L.R. 4.01. Therefore, all matters set forth in Defendant's Statement of Uncontroverted Material Facts shall be deemed admitted for purposes of summary judgment (id.).

I.  **Plaintiff's Medical Records**

On June 21, 2011, Plaintiff was transferred from Southeast Correctional Center to South Central Correctional Center ("SCCC"). (DSUMF, ¶3). Upon his transfer to SCCC, Plaintiff underwent a medical evaluation and his lay-in restrictions included no overhead reaching, a lower bunk, and no wool blanket. (Id.). On July 7, 2011, Plaintiff filed a Medical Service Request ("MSR") complaining of foot and ankle problems. (DSUMF, ¶4). During his exam, Plaintiff complained of foot and ankle pain and swelling. (Id.). The nurse noted that Plaintiff had edema to his feet and ankles. (Id.). Nurse Duggar referred Plaintiff for a doctor sick call ("DSC") for evaluation of pedal edema. (Id.).

On July 15, 2011, Plaintiff filed an MSR complaining of foot pain. (DSUMF, ¶5). On July 19, 2011, Dr. Scott examined Plaintiff. (DSUMF, ¶6). Plaintiff complained of swelling in his feet and ankles as well as fissures and bleeding of his finger. (Id.). Dr. Scott observed periungual dyschromia[2] on all fingers but no fissures or bleeding. (Id.). Dr. Scott did not change Plaintiff's regimen. (Id.). On July 26, 2011, Plaintiff refused his medications, Zocor[3] and Niacin[4]. (DSUMF, ¶7).

---

[2] Periungual dyschromia is discoloration of the area around the fingernails. See http://medical-dictionary.thefreedictionary.com/periungual;http://medical-dictionary.thefreedictionary.com/dyschromia.

[3] Zocor (simvastatin) belongs to a group of drugs called HMG CoA reductase inhibitors, or "statins". Simvastatin reduces levels of "bad" cholesterol (low-density lipoprotein, or LDL) and triglycerides in the blood, while increasing levels of "good" cholesterol (high-density lipoprotein, or HDL). Zocor is used to lower cholesterol and triglycerides (types of fat) in the blood. Zocor is also used to lower the risk of stroke, heart attack, and other heart complications in people with diabetes, coronary heart disease, or other risk factors. See http://www.drugs.com/zocor.html.

[4] Niacin is a B vitamin (vitamin B3). Niacin is used to treat and prevent a lack of natural niacin in the body, and to lower cholesterol and triglycerides (types of fat) in the blood. It is also used to lower the risk of heart attack in people with high cholesterol who have already had a heart

On July 26, 2011, Dr. Scott performed a cardiovascular evaluation on Plaintiff. (DSUMF, ¶8). Dr. Scott noted that Plaintiff stated that he did not take Zocor or Niacin because the "Niacin makes me itch real bad." (Id.).

On August 7, 2011, Plaintiff stated he did not want to have his prescriptions for Zocor or Niacin refilled. (DSUMF, ¶11). On August 10, 2011, Plaintiff filed a MSR, in which he complained of dry skin and requested lotion. (DSUMF, ¶12).

On August 15, 2011, Plaintiff was examined by Dr. Scott. (DSUMF, ¶13). Dr. Scott determined that Plaintiff had mild xerosis (or dry skin), no fissuring or bleeding of his fingers. (DSUMF, ¶14). Dr. Scott also noted that Plaintiff had some dyschromia in the periungal areas of both bands. (Id.). Based upon his examination, Dr. Scott believed that Plaintiff did not need any extra soap and that Plaintiff could obtain lotion from the canteen. (Id.).

On August 27, 2011, Plaintiff was seen for medication renewal of emollient lotion and Clobetasol cream. (DSUMF, ¶15). At the appointment, Plaintiff requested another doctor besides Dr. Scott because Plaintiff claimed Dr. Scott threatened to put him in the hole the last time. (Id.). The nurse referred Plaintiff to DSC for further evaluation. (Id.).

On August 28, 2011, Plaintiff filed an MSR for chronic back pain. (DSUMF, ¶16). Plaintiff was seen by Nurse Golden, but she could not perform an examination. (Id.). Plaintiff was told that his back pain could be addressed by Dr. Scott at his already scheduled appointment. (Id.).

---

attack. It is sometimes used to treat coronary artery disease (also called atherosclerosis). See http://www.drugs.com/niacin.html.

On September 9, 2011, Plaintiff filed an MSR complaining of dry skin. (DSUMF, ¶17). On September 12, 2011, Plaintiff refused his scheduled appointment with Dr. Scott. (Id.). On September 19, 2011, Plaintiff refused Zocor and Niacin. (DSUMF, ¶18).

On October 2, 2011, Plaintiff filed an MSR requesting renewal of several medications and his "lay-in" for no prolonged standing. (DSUMF, ¶19). The nurse referred Plaintiff to DSC. (Id.). Plaintiff refused to see Dr. Scott regarding his request for renewal of his medication and lay-in. (DSUMF, ¶20). On October 18, 2011, Plaintiff refused Zocor and Niacin. (DSUMF, ¶21).

On November 5, 2011, Plaintiff had an appointment with a nurse where he stated that he needed to see the doctor to get a lay-in for no prolonged standing and to get his prescription for Metamucil renewed. (DSUMF, ¶22). The nurse noted no signs of distress and referred Plaintiff to the DSC. (Id.).

On November 29, 2011, Plaintiff had an appointment with Dr. Scott where Plaintiff asked for a renewal of his lay-ins and medications. (DSUMF, ¶23). Dr. Scott noted that Plaintiff had refused having his lab testing since October 10, 2011. (Id.). Plaintiff promised to have his lab work performed. (Id.). Dr. Scott renewed Plaintiff's prescription for psyllium packets and hydrocortisone lotion, and renewed Plaintiff's lay-ins. (Id.).

On December 1, 2011, Plaintiff had his blood lab drawn (DSUMF, ¶24), but on December 22, 2011, Plaintiff refused additional blood work (DSUMF, ¶26). On January 5, 2012, Plaintiff refused Zocor and Niacin. (DSUMF, ¶27).

On January 23, 2012, Plaintiff had a nursing encounter appointment for the cardiovascular clinic where the nurse encouraged Plaintiff to engage in exercise, reduce his weight, and cease smoking. (DSUMF, ¶28).

On January 23, 2012, Plaintiff had an examination at the endocrine clinic. (DSUMF, ¶29). Plaintiff was instructed on his medications, avoiding caffeine, smoking cessation, weight reduction and exercise. (Id.).

On January 30, 2012, Plaintiff had an appointment with Dr. Jihad Ibrahim for a cardiovascular chronic care clinic evaluation. (DSUMF, ¶30). Plaintiff had been diagnosed with hyperlipidemia and hypothyroidism in 2004. (Id.). At his appointment, Plaintiff admitted he had not been taking the Niacin and Zocor. (Id.). Dr. Ibrahim discontinued Plaintiff's prescription for Niacin because Plaintiff stated he could not tolerate it. (Id.). Dr. Ibrahim scheduled a chronic care visit in six months. (Id.).

On February 27, 2012, Plaintiff refused colace, vitamin E, and his mental health medications. (DSUMF, ¶31). On March 4, 2012, Plaintiff filed an MSR requesting medications for his arthritis. (DSUMF, ¶32). Plaintiff had a nurse encounter visit but was referred to DSC for medication questions. (Id.).

On March 9, 2012, Plaintiff was transferred from Housing Unit 5 to Segregation and underwent an initial evaluation. (DSUMF, ¶33). Plaintiff showed no signs of trauma and had no health complaints. (Id.).

On March 11, 2012, Plaintiff filed an MSR complaining of intentional infliction of emotional distress and alleging that correctional officers and Mr. J. Allen were trying to murder him in the hole. (DSUMF, ¶34). Plaintiff was referred for a mental health appointment. (Id.).

On March 13, 2012, Plaintiff complained of anxiety that made his heart hurt. (DSUMF, ¶35). The nurse examined him and found that his vitals were within normal limits. (Id.). Plaintiff was told to take his medication, exercise, and return to sick call if he felt weak or dizzy. (Id.).

On March 17, 2012, Plaintiff filed an MSR for an increase in his medication due to additional emotional distress, humiliation, and retaliation. (DSUMF, ¶36).

On March 20, 2012, Dr. Scott entered an order that Plaintiff should not engage in any prolonged standing for thirty minutes for one year. (DSUMF, ¶37).

On March 21, 2012, Plaintiff refused to be seen by Dr. Scott. (DSUMF, ¶38).

On March 25, 2012, Plaintiff filed an MSR complaining that he was being intentionally and knowingly mistreated. (DSUMF, ¶39). The triage nurse referred Plaintiff for a mental health appointment. (Id.).

On March 29, 2012, Plaintiff filed an MSR complaining that he had a blood clot in the vein behind his right knee. (DSUMF, ¶40). On March 30, 2012, Dr. Scott examined Plaintiff. (DSUMF, ¶41). Plaintiff complained of a history of right leg pain. (Id.). Dr. Scott determined that Plaintiff suffered from superficial small vein phlebitis. (Id.). Dr. Scott recommended ice and ibuprofen. (Id.).

On April 2, 2012, Plaintiff told Nurse Towns that he had a blood clot in his right knee. (DSUMF, ¶42). Nurse Towns noted that Plaintiff's right leg appeared normal, with no swelling and a palpable pulse to the limbs. (Id.). Plaintiff was referred to the physician. (Id.).

On April 3, 2012, Plaintiff complained to Nurse Breeden that his leg was knotted up. (DSUMF, ¶43). Nurse Breeden noted a half dollar size nodule behind Plaintiff's right leg. (Id.). Nurse Breeden reported her findings to the onsite physician. (Id.).

On April 4, 2012, Plaintiff filed an MSR regarding his alleged blood clots. (DSUMF, ¶44). Plaintiff was advised that he would be seen during the routine nurse sick call. (Id.).

On April 5, 2012, Plaintiff filed another MSR complaining of his blood clots. (DSUMF, ¶45). Plaintiff was again told that he would be seen during the routine nurse sick call. (Id.).

On April 7, 2012, Plaintiff again complained of blood clots. (DSUMF, ¶46).

On April 9, 2012, Plaintiff refused treatment from the nurse. (DSUMF, ¶47).

On April 17, 2012, Plaintiff filed an MSR requesting a lay in for double cuffs "immediately." (DSUMF, ¶48). Plaintiff was told that this would be addressed at nurse sick call. (Id.). On April 18, 2012, Plaintiff refused to attend his nurse sick call appointment. (DSUMF, ¶49).

On April 23, 2012, Plaintiff filed an MSR regarding his blood clots in his right leg. (DSUMF, ¶50). Plaintiff was scheduled for a routine nurse sick call appointment and a mental health appointment. (Id.).

On April 24, 2012, Plaintiff refused his nurse sick call appointment. (DSUMF, ¶51). On April 25, 2012, Plaintiff refused a mental health appointment. (DSUMF, ¶52).

On May 20, 2012, Plaintiff filed an MSR, complaining that he needed tennis shoes and that he had arthritis in his ankles and blood clots. (DSUMF, ¶53). Plaintiff was scheduled for a routine sick call appointment. (Id.).

On May 23, 2012, Plaintiff met with the nurse. (DSUMF, ¶54). Plaintiff stated that he had no leg pain even though he complained of blood clots. The nurse did not observe any signs of distress and noted no swelling or discoloration of the legs. (Id.). Plaintiff was told that he should return to nurse sick call when he is out of segregation regarding his tennis shoes request. (Id.). Plaintiff was referred to the doctor for an appointment. (Id.).

**II.     Plaintiff's Grievance Records**

A. IRR No. SCC-11-1354

On or around August 18, 2011, Plaintiff filed an Informal Resolution Request (IRR), SCCC-11-1354. (DSUMF, ¶55). In his IRR, Plaintiff stated that he had been told by Housing

Unit 5 staff that if he needed additional soap, then he would have to file a grievance with the medical department requesting four bars of soap a week since security officers only issue single use bars every two weeks. (Id.). Plaintiff claimed that, on August 14, 2011, Dr. Scott threatened Plaintiff with segregation if he continued to complain about not having soap. (Id.).

On September 8, 2011, Edie McDaniel, Director of Nursing, responded to Plaintiff's IRR. (DSUMF, ¶56). Ms. McDaniel investigated Plaintiff's concerns and found that Plaintiff was seen on August 15, 2011 by the physician, who determined that additional soap was not medically necessary. Ms. McDaniel concluded that Plaintiff would not be given extra soap from medical, but he could buy it from the canteen.

On or around September 15, 2011, Plaintiff filed a related Grievance. (DSUMF, ¶57). Plaintiff stated that he only received $3.40 a month and that he was being forced to choose between legal supplies and hygiene items. (Id.).

On October 21, 2011, Dr. Ibrahim, Medical Director, responded by advising Plaintiff that there was no medical need for his extra soap. (DSUMF, ¶58).

Plaintiff filed a Grievance Appeal, dated November 15, 2011. (DSUMF, ¶59). A written response denying his appeal was prepared on February 10, 2012. (Id.). Ms. Cofield concluded that Plaintiff's Grievance Appeal was not supported because he had been provided appropriate care and treatment for his medical issues by licensed, qualified health professionals. (DSUMF, ¶60). Plaintiff had been last seen on August 15, 2011 for that issue and was told he had no medical need for additional soap. (DSUMF, ¶59). Plaintiff had purchased 3 bars of Dial Gold soap in August 2011 from the canteen and was instructed to continue to purchase extra soap, as needed. (Id.). Plaintiff was told to utilize the sick call process if there was any change to his medical condition. (DSUMF, ¶60).

B. IRR No. SCCC-11-1404

Plaintiff filed IRR SCCC-11-1404, dated September 1, 2011, wherein he complained that he needed moisturizer for dry, cracking skin. (DSUMF, ¶61). Plaintiff asserted that Dr. Scott refused to renew his lotion prescription after Plaintiff told Dr. Scott that Plaintiff had filed a lawsuit to be prescribed the lotion. (Id.).

On September 8, 2011, Ms. McDaniel prepared a Response to Plaintiff's IRR No. SCCC-11-1404. (DSUMF, ¶62). Ms. McDaniel noted that Plaintiff had an active prescription for hydrocortisone lotion and that he could purchase moisturizer from the canteen. (Id.).

Plaintiff then filed a Grievance, dated September 15, 2011, related to IRR No. SCC-11-1404. (DSUMF, ¶63). Plaintiff complained that his skin was cracking and bleeding. (Id.). Plaintiff stated that he receives only $3.40 a month and that he should not have to choose between buying legal supplies and hygiene items. (Id.).

Ms. Todaro and Dr. Ibrahim prepared a Response, dated October 21, 2011. (DSUMF, ¶64). The Response stated that Plaintiff had been assessed by Dr. Scott on August 15, 2011, and Plaintiff had no medical indication for lotion. (Id.). The Response told Plaintiff that he could purchase lotion from the canteen and he had been provided all medically necessary health care. (Id.). Plaintiff filed a Grievance Appeal, dated November 15, 2011. (DSUMF, ¶65). A response denying his appeal was prepared on February 10, 2012. (Id.). Regional Director, J. Cofield, found that Plaintiff's grievance was unfounded because he was seen and examined by his physician and was informed that lotion was available in the canteen. (Id.).

C. IRR No. SCCC-11-1710

On October 21, 2011, Plaintiff filed IRR No. SCCC-11-1710. (DSUMF, ¶67). Plaintiff stated that Dr. Scott threatened him that if Plaintiff asked for any prescriptions or hygiene items

- 9 -

then Dr. Scott would have him thrown in the "hole." (Id.). Plaintiff claimed that he needed his medications and lay-ins renewed, but Dr. Scott refused to renew his prescriptions or renew his lay-in for no prolonged standing. (Id.). Plaintiff requested seeing another doctor. (Id.).

Ms. McDaniel prepared a Response, dated November 2, 2011, to Plaintiff's IRR. (DSUMF, ¶68). Ms. McDaniel stated that she discussed the complaint with Plaintiff and it was not resolved. (Id.). Ms. McDaniel offered to be present when Plaintiff saw the physician but that Dr. Scott was in charge of his medical care at SCCC. (Id.). She advised Plaintiff to utilize the sick call process if his condition changed. (Id.).

Plaintiff filed a Grievance, dated November 4, 2011, related to IRR No. SCCC-11-1710. (DSUMF, ¶69). In the Grievance, Plaintiff stated that he wanted to be comfortable with his medical provider and that Dr. Scott "obviously hates blacks." (Id.).

Ms. Todaro and Dr. Ibrahim prepared a Response, dated December 2, 2011. (DSUMF, ¶70). The Response identified that Plaintiff had been assessed by Dr. Scott on July 19, 2011, August 15, 2011, and November 29, 2011, but that on September 12, 2011 and October 21, 2011 Plaintiff had refused treatment. (Id.). On November 29, 2011, Plaintiff's lay-ins were renewed and his medications (hydrocortisone lotion and Metamucil) were refilled. (Id.). Dr. Ibrahim concluded that Plaintiff had been assessed and treated properly based upon his symptom. (Id.).

Plaintiff filed a Grievance Appeal, dated December 27, 2011. (DSUMF, ¶71). Regional Director J. Cofield prepared a written response denying Plaintiff's Grievance Appeal on March 7, 2012. (Id.). Ms. Cofield determined that Plaintiff had received appropriate medical care from Dr. Scott and, more recently, Dr. Ibrahim. (Id.). Ms. Cofield concluded that Plaintiff's Grievance Appeal was not supported by the medical record and that Plaintiff should utilize the sick call process if his medical condition changed. (DSUMF, ¶72).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011). The substantive law determines which facts are critical and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome will properly preclude summary judgment. Id. Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A moving party always bears the burden of informing the Court of the basis of its motion. Celotex Corp., 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 248. The nonmoving party may not rest upon mere allegations or denials of his pleading. Anderson, 477 U.S. at 258.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. Celotex Corp., 477 U.S. at 331. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" Torgerson, 643 F.3d at 1042 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

# DISCUSSION

"A prison official is deliberately indifferent if she 'knows of and disregards' a serious medical need or a substantial risk to an inmate's health or safety." Nelson v. Corr. Med. Servs., 583 F.3d 522, 528-29 (8th Cir. 2009)(citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)). A claim of deliberate indifference has both an objective and a subjective component. Nelson v. Corr. Med. Servs., 583 F.3d at 529; Farmer, 511 U.S. at 838–39. Thus, the relevant questions here are: (1) whether Plaintiff had a serious medical need or whether a substantial risk to her health or safety existed, and (2) whether Defendant had knowledge of such serious medical need or substantial risk to the plaintiff's health or safety but nevertheless disregarded it. Nelson v. Corr. Med. Servs., 583 F.3d at 529; Farmer, 511 U.S. at 842. The second part of the test requires plaintiff to prove that the prison official was more than negligent. Alberson v. Norris, 458 F.3d 762, 765 (8th Cir. 2006).

A. No Evidence of the Existence of a Serious Medical Condition

First, Plaintiff has failed to demonstrate the existence of a serious medical condition. Plaintiff alleges that he suffers from dry skin and a blood clot in his right leg. Plaintiff provides no support for his claim that dry skin is a serious medical condition. Plaintiff claims that his dry skin was a serious medical condition such that it is "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." (ECF No. 39 at 2 (citing Johnson v. Busby, 953 F.2d 349 (8th Cir. 1991)). The Court, however, finds that dry skin is a common problem that is frequently treated without medical intervention. Examination of Plaintiff's hands revealed that he suffered from ordinary, run-of-the-mill dry skin. The medical record shows that when Dr. Scott and other medical professionals examined Plaintiff's hands he did not suffer from bleeding, cracking, fissures or other more serious skin conditions that could possibly qualify as a

serious medical condition. The Court holds that Plaintiff's dry skin did not qualify as a serious medical condition as a matter of law.

Second, Plaintiff has presented no evidence that he suffered from blood clots. The record reflects that Plaintiff believed that he had blood clots. See ECF No. 39 ("I am under the firm opinion that at the time I was suffering from (DVT) Deep Vein Thromosis…). But Plaintiff's unsupported contention that he suffered from blood clots was discounted after he was examined by several medical professionals. See Aswegan v. Henry, 49 F.3d 461, 465 (8th Cir. 1995)(no constitutional violation where plaintiff testified that he had a medical condition such that he could not be confined in small shower stalls, but that contention was "completely unsupported by the documentary medical evidence from those physicians"). The Court finds, as a matter of law, that Plaintiff did not suffer from a serious medical condition because there is no objective, verifiable medical evidence that Plaintiff suffers from blood clots.

B. No Evidence that Dr. Scott Disregarded a Serious Medical Condition

Further, the evidence before the Court demonstrates that Dr. Scott did not disregard Plaintiff's complaints that he suffered from dry skin or a blood clot. The record reflects that Plaintiff had been assessed by Dr. Scott on July 19, 2011, August 15, 2011, November 29, 2011, and March 30, 2012, but that on September 12, 2011, October 21, 2011, and March 21, 2012 Plaintiff had refused treatment. Likewise, Plaintiff was seen by nurses on several occasions to evaluate his complaints of dry skin and blood clots. Dr. Scott determined that Plaintiff's dry skin was not broken or bleeding and could be controlled with lotion from the canteen as well as hydrocortisone cream, which Dr. Scott prescribed. Likewise, Dr. Scott evaluated Plaintiff's complaints that he suffered from a blood clot but, based upon his objective findings, determined that there was no such clot. Plaintiff has provided no objective medical evidence that he

suffered from any excessive dry skin or a blood clot. Likewise, Plaintiff has not demonstrated that Dr. Scott intentionally delayed treatment of Plaintiff's dry skin and alleged blood clot. See Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)("Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs."). "The objective portion of the deliberate indifference standard requires a showing of 'verifying medical evidence' that the defendants ignored an acute or escalating situation or that delays adversely affected the prognosis given the type of injury in this case." Dulany, 132 F.3d at 1243 (quoting Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir.1997); Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir.1995)). Plaintiff's medical needs were not disregarded, and he has no verifiable medical evidence to indicate that the delay in treating his dry skin and/or blood clot adversely affected his prognosis. Thus, Plaintiff has not raised a genuine dispute of fact from which a trier of fact could conclude that Dr. Scott was deliberately indifferent to Plaintiff's serious medical needs and to support Plaintiff's claim that Dr. Scott violated his constitutional rights. Therefore, the Court grants Dr. Scott's Motion for Summary Judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Motion for Summary Judgment of Defendant Dr. Charles Scott [29] is **GRANTED**.

Dated this 5th day of February, 2014.

_____
**JOHN A. ROSS
UNITED STATES DISTRICT JUDGE**